IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SERGUEI GOLOVAN,

                Plaintiffs;

v.

UNIVERSITY OF DELAWARE, et al.,

                Defendants.

Civil Action No. 13-862-RGA

## MEMORANDUM OPINION

C. Scott Reese, Esq., COOCH & TAYLOR, P.A., Wilmington, DE; Christopher Lee, Esq., COOCH & TAYLOR, P.A., Wilmington, DE; Ryan Lockman, Esq., MARK B. FROST & ASSOCIATES, Philadelphia, PA; Mark B. Frost, Esq., MARK B. FROST & ASSOCIATES, Philadelphia, PA.

    Attorneys for Plaintiff Serguei Golovan.

William E. Manning, Esq., SAUL EWING LLP, Wilmington, DE; James D. Taylor, Esq., SAUL EWING LLP, Wilmington, DE; Gerard M. Clodomir, SAUL EWING LLP, Wilmington, DE.

    Attorneys for Defendants University of Delaware, Jack Gelb, Jr., Mark Rieger, and Robin Morgan.

November 6, 2014

1

*signature* 
**ANDREWS, U.S. DISTRICT JUDGE:**

On May 17, 2013, Serguei Golovan filed suit against Defendants University of Delaware (the "University"), Jack Gelb, Jr., Mark Rieger, and Robin Morgan, alleging violation of Plaintiff's procedural due process rights under the Fourteenth Amendment and breach of contract. (D.I. 3). On May 15, 2014, Plaintiff filed a motion to amend his complaint to include two additional claims—First Amendment retaliation and violation of Delaware's Whistleblowers' Protection Act. (D.I. 30). The Court will grant Plaintiff's motion to amend his complaint.

Presently before the Court is Defendants' motion for summary judgment. (D.I. 35). Defendants' motion addresses Plaintiff's two original claims and two new claims. The motion has been fully briefed. (D.I. 36, 41 & 48). For the reasons set forth herein, Defendants' motion for summary judgment is granted with regard to each of Plaintiff's four claims.

## I. Background

Because the Court is reviewing Defendants' motion for summary judgment, the Court must view the facts in the light most favorable to Plaintiff. On July 11, 2008, Plaintiff received a retention letter (the "Retention Letter") from Dr. Morgan, Dean of the College of Agriculture and Natural Resources, offering Plaintiff appointment as a tenure-track assistant professor at the University beginning September 1, 2008. (D.I. 42, Ex. 2). The Retention Letter states in relevant part:

> This faculty appointment is full-time and for an initial period of two years. The probationary period for assistant professors shall normally be no longer than six years from the date of first appointment as assistant professor at the University of Delaware. In your case, you would normally be eligible to be considered for tenure not later than the 2013–2014 academic year (your sixth year of academic service) with tenure effective, if the decision is

2

favorable, starting with the fall semester of the 2014–2015 academic year. Separate and apart from your annual performance appraisal, you will be evaluated through peer review regarding your progress toward tenure, according to the procedures set forth in the University's Handbook, for Faculty and the Promotion and Tenure Policies and Procedures of the department and college.

(*Id.* at 23). With regard to promotion and tenure, the University's Faculty Handbook states:

> Tenure-track assistant professors are appointed to full-time faculty positions for an initial term of two years without tenure. Reappointment at this rank are [sic] for a two-year term. The probationary period for assistant professors is six years, divided into three successive two-year contracts. The start of the probationary period coincides with the effective date of initial appointment as assistant professor. This date governs the timetables for peer review for contract renewal and for review for promotion and tenure. Assistant professors are expected to be considered for promotion and tenure not later than the sixth year of full-time academic service, with tenure effective—if the decision is favorable—starting with the fall semester of the seventh academic year. If the decision on promotion and tenure is negative, the seventh year of academic service will be a terminal year. Separate and apart from annual performance appraisal by the departmental chair, assistant professors will be evaluated through peer review regarding progress toward tenure according to the procedures and timetable set forth in the Faculty Handbook. Lack of progress toward promotion and tenure may result in contract non-renewal.

(D.I. 42, Ex. 3 at 26).

On February 8, 2010, in accordance with the policies set forth in the Faculty Handbook, Plaintiff was subject to a two-year peer review for contract renewal by the Promotion and Tenure Committee (the "Committee") for the Department of Animal and Food Sciences (the "Department"). (D.I. 42, Ex. 4). In a letter from the Committee to Plaintiff and the Department Chair, Dr. Gelb, the Committee recommended that Plaintiff's contract be renewed, but expressed concerns about Plaintiff's research and scholarship. (*Id.*). With regard to Plaintiff's scholarship, the Committee gave him four votes for "Satisfactory" and one vote for "Good." (*Id.* at 29). The

3

Committee found that Plaintiff lacked a "clear research focus," and strongly recommended that he "develop a focused research program that is centered on research efforts developed at the University of Delaware." (*Id.* at 29–30). On March 2, 2010, Plaintiff received a memorandum from Dr. Gelb, reflecting similar concerns. (D.I. 42, Ex. 5). Dr. Gelb stated that it was "vital and in [Plaintiff's] best interest for [Plaintiff] to initiate research at the University of Delaware," and that "[Plaintiff] must allocate more time to [Plaintiff's] current responsibilities and less time to previous commitments to be successful at Delaware." (*Id.* at 33).

In September 2010, Plaintiff discovered that a colleague, Dr. Cogburn, who served on the Committee, was in a relationship with a female graduate student. (D.I. 46, Ex. 75 at 129:17–19). In May 2011, Plaintiff became more concerned about Dr. Cogburn's conduct with his female students, and believed Dr. Cogburn may have been violating the University's anti-discrimination/harassment policy. (*Id.* at 130:13–17). Based on this belief, Plaintiff approached Dr. Morgan, Dean of the College, and Dr. Keeler, Chair of the Committee, in the hallway of the Department, and mentioned that Dr. Cogburn may have been engaged in inappropriate sexual conduct with his female students. (*Id.* at 127:12–128:13). In response, Dr. Morgan and Dr. Keeler told Plaintiff that they would look into his claim, and that he should not discuss the matter with anyone else. (*Id.* at 128:15–19). The next day, Dr. Gelb came into Plaintiff's office to inquire about Plaintiff's allegations regarding Dr. Cogburn, and told Plaintiff that he and Dr. Morgan would "deal with it." (*Id.* at 131:4–13).

After Plaintiff's discussions with Dr. Morgan, Dr. Keeler, and Dr. Gelb, Dr. Cogburn became "frosty" toward Plaintiff, and Dr. Morgan and Dr. Gelb seemed to be "upset." (*Id.* at 132:6–9). In 2011, Plaintiff asked Dr. Gelb about grant money that Plaintiff had received from Avian Biosciences Center (ABC) as a part of a four professor team, and Dr. Gelb informed him

4

that the money had been spent. (*Id.* at 147:20–148:3). In August 2011, Dr. Gelb refused to provide additional funding for Plaintiff's provisional patent application. (D.I. 44, Ex. 29 at 20). In 2011, Dr. Gelb also refused to renew the contract of Plaintiff's post-doctoral student. (D.I. 46, Ex. 75 at 148:10–14). Finally, in 2012, Plaintiff received a poor annual performance appraisal from Dr. Gelb. (*Id.* at 151:1–12).

On May 18, 2012, Plaintiff received his four-year peer review for contract renewal from the Committee, and the Committee unanimously voted not to renew Plaintiff's contract. (D.I. 42, Ex. 6). With regard to Plaintiff's scholarship, he received four "Unsatisfactory" votes, and one "Satisfactory" vote. (*Id.* at 36). The Committee maintained the same concerns reflected in Plaintiff's two-year review, finding that Plaintiff lacked the "productivity and extramural competitive grant support" to develop a fundable research focus, and that he had "not made acceptable progress towards a successful promotion and tenure application." (*Id.* at 37). On May 25, 2012, Dr. Gelb, the Department Chair, agreed with the Committee's decision and recommended that Plaintiff's contract renewal be denied. (D.I. 42, Ex. 7). On June 18, 2012, Dr. Morgan, the Dean of the College, agreed with both the Committee and Dr. Gelb's assessment and refused to renew Plaintiff's contract. (D.I. 42, Ex. 8). On September 4, 2012, Plaintiff met with Dr. Rieger, the new Dean of the College, to discuss appealing the decision not to renew Plaintiff's contract. (D.I. 42, Ex. 11 at 51). After this meeting, Plaintiff filed a formal letter of appeal to Dr. Reiger. (D.I 42, Ex. 10). Upon review, Dr. Rieger upheld the decisions of Dr. Morgan, Dr. Gelb, and the Committee not to renew Plaintiff's contract. (D.I. 42, Ex. 11).

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a

6

reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## III. Discussion

Plaintiff's amended complaint raises four distinct claims: (1) deprivation of Fourteenth Amendment procedural due process; (2) breach of contract; (3) First Amendment retaliation; and (4) violation of Delaware's Whistleblowers' Protection Act. (D.I. 30, Ex. 1). Defendants move for summary judgment on each of these claims.

### A. Procedural Due Process Claim

Plaintiff contends that Defendants violated his right to procedural due process under the Fourteenth Amendment. "The Fourteenth Amendment prohibits state deprivations of life, liberty, or property without due process of law." *Thomas v. Independence Twp.*, 463 F.3d 285, 297 (3d Cir. 2006). In order to state a claim for violation of procedural due process a plaintiff must show: (1) deprivation of an individual interest in "life, liberty, or property" under the Fourteenth Amendment, and (2) failure to provide "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234–35 (3d Cir. 2006).

#### 1. Property Interest

Plaintiff argues that he had a property interest in continued employment at the University until the sixth year of his employment.[1] "To have a property interest in a benefit, a person . . .

---

[1] Plaintiff does not argue that he had a property interest in the specific procedures set forth in the Faculty Handbook for evaluating promotion and tenure. *See Goodisman v. Lytle*, 724 F.2d 818, 821 (9th Cir. 1984). Nevertheless, the University's procedures for evaluating promotion and tenure do not significantly limit the University officials' discretion in making promotion and tenure decisions, and thus are not constitutionally significant.

7

must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Whether a person has a legitimate entitlement to a governmental job must be answered under state law. *Hill*, 455 F.3d at 234. Here, Plaintiff relies on contract law as the basis for his property interest in continued employment. Under Delaware law, "[c]ontracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms." *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 983 (Del. Ch. 2010). "When a contract is clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract." *Id.*

The terms of Plaintiff's employment agreement with the University are clearly established by the language in the Retention Letter and Faculty Handbook. The Retention Letter states: "Separate and apart from your annual performance appraisal, you will be evaluated through peer review regarding your progress toward tenure, according to the procedures set forth in the University's Handbook, for Faculty and the Promotion and Tenure Policies and Procedures of the department and college." In addition, the Faculty Handbook states: "Tenure-track assistant professors are appointed to full-time faculty positions for an initial term of two years without tenure. Reappointment at this rank are [sic] for a two-year term. The probationary period for assistant professors is six years, divided into three successive two-year contracts." The Faculty Handbook also states that "[l]ack of progress toward promotion and tenure may result in contract non-renewal." The plain meaning of the language is clear—Plaintiff was hired for a probationary period of six years, made up of three two-year contracts. The Faculty Handbook makes clear that Plaintiff's contract renewal would be based on adequate progress toward promotion and tenure, as judged by the peer review process.

Additionally, the record shows that Plaintiff did not have an expectation of continued employment. Plaintiff received an e-mail from the Department Chair prior to his two-year review stating that "[a] favorable two-year review will be the basis for offering [Plaintiff] a two-year reappointment/contract." (D.I. 36, Ex. F). Plaintiff received a nearly identical e-mail prior to his four-year review as well. (D.I. 36, Ex. N). Plaintiff was made well aware, in his employment agreement and in subsequent correspondence, that he was not entitled to renewal of his contract, and that if his contract was renewed, it was only for two years. Any reappointment was contingent on a favorable review. Thus, even in the light most favorable to Plaintiff, Plaintiff fails to establish that he had a property interest in continued employment after four years.

### 2. Liberty Interest

Plaintiff also argues that Defendants deprived him of a liberty interest by terminating his employment in a manner that prevented him from obtaining subsequent employment. It is well settled that reputation alone is not a protected interest under the Fourteenth Amendment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006) (citing *Paul v. Davis*, 424 U.S. 693, 712 (1976)). To determine whether a person has been deprived of a liberty interest in reputation, courts apply the "stigma-plus" test, which requires a plaintiff to show "a stigma to his reputation *plus* deprivation of some additional right or interest." A public employee is deprived of a protected liberty interest "when an employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Id.* Under the stigma-plus test, "the creation and dissemination of a false and defamatory impression is the 'stigma,' and the termination is the 'plus.'" *Id.* "To satisfy the 'stigma' prong of the test, it must be alleged that the purportedly stigmatizing statements(s) (1) were made publicly, and (2) were false." *Id.*

9

Here, Plaintiff has failed to show the creation or dissemination of any false or defamatory statements regarding his termination. The only statements made about Plaintiff, so far as the record shows, were contained in letters sent to him by the Committee, Department Chair, and Dean of the College regarding Plaintiff's peer review for contract renewal. Plaintiff argues that his inability to obtain subsequent employment is evidence of stigma, but Plaintiff has failed to allege that any of Defendants' statements were disseminated publicly. Further, Plaintiff has not alleged that any of Defendants' statements were false. Thus, Plaintiff has failed to establish the stigma prong.

In addition, Plaintiff has failed to allege that Defendants made any charges against him in connection with the non-renewal of his contract. In *Roth*, the Court held that a non-tenured assistant professor was not deprived of a liberty interest because "in declining to rehire the [professor], [the university] did not make any charge against him that might seriously damage his standing and associations in his community." *Roth*, 408 U.S. at 573. The Court noted that the university "did not base the nonrenewal of [the professor's] contract on a charge, for example, that he had been guilty of dishonesty, or immorality." *Id.* Here, like *Roth*, Defendants made no charge against Plaintiff that he was guilty of "dishonesty," "immorality," or the like. Rather, the record shows that Defendants decided not to renew Plaintiff's contract based on the Committee's evaluation in Plaintiff's four-year review. As the Court in *Roth* stated, "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Roth*, 408 U.S. at 575. Plaintiff was not subject to stigmatizing statements, and remains free to seek future employment. Therefore, Plaintiff has not been deprived of a liberty interest in his reputation.

### 3. Sufficient Process

Even if Plaintiff had been deprived of a property or liberty interest, Defendants provided Plaintiff with sufficient due process to satisfy the requirements of the Fourteenth Amendment. Plaintiff argues that he was deprived of due process because the peer review process lacked "written rating criteria, standards, [and] procedures." (D.I. 41 at 20). Plaintiff, however, fails to provide any case law supporting this proposition. "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). In the context of public employment, a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* Here, Plaintiff was not a tenured professor, but received all three of the due process requirements for tenured public employees.

The record shows that Plaintiff received more than adequate notice of his four-year review and the Department's intention not to renew his contract. Plaintiff received an e-mail from Dr. Gelb on August 18, 2011, almost a year before Plaintiff's four-year review, informing Plaintiff that his four-year review would take place in the coming year. (D.I. 36, Ex. N). In this e-mail, Dr. Gelb explained that Plaintiff's four-year review would be conducted by the Committee and that the review would be based on "evidential materials presented in [Plaintiff's] dossier." (*Id.*). Plaintiff was also informed that Dr. Gelb would review Plaintiff's dossier as Department Chair and make a recommendation to the Dean of the College, who would then review Plaintiff's dossier and make a final recommendation. (*Id.*) Dr. Gelb made clear that "[a] favorable four-year review will be the basis for offering [Plaintiff] a two-year reappointment/contract." (*Id.*). After Plaintiff's four-year review, Plaintiff received letters from the Committee, Department Chair, and Dean, informing Plaintiff that his contract would not be

11

renewed after his second two-year term. The Committee, Department Chair, and Dean's letters all provided detailed reasoning as to why Plaintiff's contract was not recommended for renewal. Thus, Plaintiff received more than sufficient notice to satisfy the due process requirement.

Plaintiff also argues that his appeal was insufficient because his claims were not reviewed "*de novo.*" The Court disagrees. On appeal, Dr. Rieger, the new Dean of the College, met with Plaintiff to discuss the Committee's decision, reviewed Plaintiff's dossier, and re-read the letters from the Committee, Dr. Gelb, and Dr. Morgan. In a letter to Plaintiff on August 29, 2012, Dr. Rieger instructed Plaintiff to focus his appeal on: "(1) errors of fact that may have led to a misrepresentation of [Plaintiff's] body of work; and (2) new and relevant information about [Plaintiff's] performance that was not considered previously by the committee or Dean Morgan." (D.I. 42, Ex. 9 at 45). Plaintiff then submitted a formal letter to Dr. Rieger detailing the grounds of his appeal and arguing for reconsideration. After reviewing Plaintiff's appeal, Dr. Rieger found that Dr. Morgan, Dr. Gelb, and the Committee had accurately assessed Plaintiff's performance, and upheld their decision not to renew Plaintiff's contract. The record shows that the appeal process gave Plaintiff ample opportunity to "present his side of the story," and thus provided Plaintiff with sufficient due process. For the reasons stated above, summary judgment is granted in favor of Defendants with regard to Plaintiff's due process claim.

### B. Breach of Contract Claim

Plaintiff argues that Defendants breached his employment agreement by refusing to renew his contract after his second two-year term. As stated above, "[c]ontracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms." *SV Inv. Partners, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 983 (Del. Ch. 2010). "When a contract is

clear on its face, the court should rely solely on the clear, literal meaning of the words contained in the contract." *Id.*

Here, the Retention Letter clearly refers to the Faculty Handbook regarding the University's policies on promotion and tenure. The Faculty Handbook makes clear that Plaintiff was hired for a six-year probationary period, consisting of three consecutive two-year contracts.[2] Pursuant to the Faculty Handbook, Plaintiff was subject to a peer review after each two-year period to determine whether his contract would be renewed. The Committee had the right to vote against Plaintiff's contract renewal, and did so, according to the policies and procedures set forth in the Faculty Handbook. Plaintiff's employment agreement is unambiguous on its face, and thus, must be interpreted based on the plain meaning of its terms. Therefore, summary judgment is granted in favor of Defendants with regard to Plaintiff's breach of contract claim.

## C. Retaliation Claim

Plaintiff argues that Defendants' refusal to renew his employment contract constitutes retaliation in violation of his First Amendment rights. A First Amendment retaliation claim requires a plaintiff to show: (1) constitutionally protected conduct; (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights; and (3) a causal link between the constitutionally protected conduct and the retaliatory action. *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).

---

[2] Plaintiff alleges that he did not receive the Faculty Handbook along with his employment agreement, and thus is not bound by the Faculty Handbook's provisions. (D.I. 41 at 12). I reject this argument because the Retention Letter clearly incorporates the Faculty Handbook by reference. Under Delaware law, "[w]here a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties." *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1278 (Del. Super. Ct. 2001). Here, the Retention Letter states: "Separate and apart from your annual performance appraisal, you will be evaluated through peer review regarding your progress toward tenure, according to the procedures set forth in the University's Handbook, for Faculty and the Promotion and Tenure Policies and Procedures of the department and college." Therefore, the Retention Letter and Faculty Handbook are to be interpreted together and form Plaintiff's entire employment agreement.

13

### 1. Protected Conduct

Plaintiff argues that his statements regarding Dr. Cogburn were protected speech under the First Amendment. "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (internal quotation marks omitted) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "A public employee does not speak 'as a citizen' when he makes a statement pursuant to his official duties." *Id.* at 242. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

Plaintiff argues that he spoke as a citizen when reporting Dr. Cogburn, and not pursuant to his official duties as a professor. (D.I. 50). Plaintiff testified to making a verbal report to Dr. Morgan, Dr. Keeler, and Dr. Gelb in May 2011, regarding possible sexual harassment by Dr. Cogburn toward his female students. (D.I. 46, Ex. 75 at 127:12–128:13; 131:4–13). The Third Circuit has "consistently held that complaints up the chain of command about issues related to an employee's workplace duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties." *Morris v. Phila. Hous. Auth.*, 487 F. App'x 37, 39 (3d Cir. 2012) (citing *Hill*, 455 F.3d at 242). In Plaintiff's complaint, Plaintiff alleged that he "reasonably believed that Dr. Cogburn was violating the University anti-discrimination/harassment policy," and pursuant to that policy, Plaintiff was "required to report said violations." (D.I. 30, Ex. 1 ¶¶ 36–37). Plaintiff made his statements pursuant to his official

14

duties as a professor, under the University's anti-discrimination/harassment policy, and thus, did not make his statements as a citizen.

Plaintiff also argues that his speech involved a matter of public concern. "An employee's speech addresses public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 829 (3d Cir. 1994) (internal quotation marks omitted) (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "The content of the speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001) (internal quotation marks omitted). Thus, there is no doubt that Plaintiff's report addressed a matter of public concern. Nevertheless, since Plaintiff was not speaking as a citizen when reporting Dr. Cogburn, it is irrelevant that he was speaking about a matter of public concern. Therefore, Plaintiff's statements are not protected speech under the First Amendment.

### 2. Retaliatory Action and Causal Link

Plaintiff also fails to show a causal link between Plaintiff's report and Defendants' retaliatory action. In order to show a causal link, the protected activity must have been a substantial factor in the alleged retaliatory action. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). For timing alone to be enough to establish a causal link, "the timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred."

15

*Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (internal quotation marks omitted). In cases where temporal proximity is not close enough to be "unduly suggestive," then the appropriate test is the "timing plus other evidence test." *Id.*

Plaintiff argues that after he reported Dr. Cogburn's possible sexual harassment to Dr. Morgan, Dr. Keeler, and Dr. Gelb in May 2011, Defendants engaged in a series of retaliatory acts against him. (D.I. 41 at 15). The Court finds that Plaintiff's vague allegations are not sufficient to meet Plaintiff's burden of showing unusually suggestive temporal proximity, a pattern of antagonism, or conduct that is unusually suggestive of retaliatory motive. First, Plaintiff alleges he was denied grant money in 2011 as a result of his report, but fails to provide an approximate date for when the grant money was denied. (D.I. 46, Ex. 75 at 147:20–148:3). Further, the ABC grant was awarded to a team of four professors including Plaintiff in 2009–2010, and thus Plaintiff had been denied this grant money for over a year before making his sexual harassment report. (D.I. 42, Ex. 1 at 21). Second, Plaintiff requested funding to file a provisional patent on August 1, 2011, three months after Plaintiff's report. (D.I. 44, Ex. 29 at 20). Dr. Gelb informed Plaintiff that day that the Department and College would not be able to fund Plaintiff's provisional patent application. (*Id.*). Plaintiff then received an e-mail from the University's Technology Transfer Center on March 5, 2012, ten months after Plaintiff's sexual harassment report, informing him that the University would not pursue "conversion" of Plaintiff's provisional patent "due to the very early stage of the invention." (D.I. 45, Ex. 55 at 40). Third, Dr. Gelb did not renew Plaintiff's post-doctoral student in 2011, but Plaintiff fails to provide an approximate time for when this event occurred. (D.I. 46, Ex. 75 at 148:10–14). Even in the light most favorable to Plaintiff, these isolated events do not meet the unusually suggestive

temporal proximity standard, do not amount to a pattern of antagonism, and do not otherwise suggest a retaliatory motive.

Plaintiff also attributes his negative 2011 annual appraisal to retaliation. (*Id.* at 151:1–12). The Third Circuit has declined to infer a causal link for purposes of retaliation where the employee's negative performance evaluations predate the protected activity. *See Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000). Prior to Plaintiff's report of sexual harassment in May 2011, Plaintiff had received three consecutive subpar annual appraisals and one lackluster two-year review. (D.I. 36, Exs. I & G). The Committee's decision not to renew Plaintiff's contract after his four-year review was entirely consistent with Plaintiff's prior evaluations. (*Id.*). Plaintiff's annual appraisals from 2008–2011 all reflected concerns about Plaintiff's research focus and his progress in developing his own research. (D.I. 36, Exs. I & M). In Plaintiff's 2010 annual appraisal, the one immediately preceding Plaintiff's report of sexual harassment, the Department Chair wrote "there was little evidence that [Plaintiff] has progressed at UD in developing his own research program." (D.I. 36, Ex. I at 24). In Plaintiff's two-year review in February 2010, the Committee gave Plaintiff's scholarship four "Satisfactory" votes, and found that his research lacked a clear focus. (D.I. 36, Ex. G at 4–5). The Department Chair's letter to Plaintiff after his two-year review implored Plaintiff to allocate more time to research at the University and less time to prior commitments from his former university. (D.I. 36, Ex. H). It is clear from the record that Plaintiff's negative reviews predated his sexual harassment claim and were consistent throughout his time at the University.

Finally, the Committee was made of five members who voted unanimously, by way of individual secret ballot, against renewing Plaintiff's contract. (D.I. 42, Ex. 6). Dr. Keeler had knowledge of Plaintiff's report. There is no evidence in the record, however, that the other four

members of the Committee had this knowledge.[3] It follows that four out of the five professors on the Committee decided not to renew Plaintiff's contract without knowledge of Plaintiff's report. Plaintiff also argues that Dr. Morgan and Dr. Gelb had knowledge of Plaintiff's report and both wrote letters approving the Committee's decision. (D.I. 41 at 12–13). Regardless of Dr. Morgan and Dr. Gelb's knowledge of Plaintiff's report, their approval of the Committee's decision was reviewed and affirmed by Dr. Rieger on appeal. (D.I. 42, Ex. 11). There is no evidence in the record that Dr. Rieger had any knowledge of Plaintiff's report, and thus, there is no causal link between Plaintiff's report and Dr. Rieger's decision to uphold the Committee's decision. Viewing the evidence in the light most favorable to Plaintiff, the Court finds no causal link between Plaintiff's report and the non-renewal of his contract. For all the reasons set forth above, summary judgment is granted in favor of Defendants with regard to Plaintiff's First Amendment retaliation claim.

### D. Whistleblower Claim

Under the Delaware Whistleblowers' Protection Act (WPA):

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment . . . because the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur . . . .

19 Del. C. § 1703(4).

A violation is defined as an act or omission that is "[m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to a law, rule, or regulation promulgated

---

[3] Dr. Cogburn was on the Committee. Even if Dr. Cogburn knew that he had been reported for sexual harassment, there is no evidence that he would have known who reported him.

18

under the laws of this State . . . ." *Id.* § 1702(6). If the employee makes a verbal report, the employee must establish that the report was made by "clear and convincing evidence." *Id.* § 1703(4). The burden of proof is on the employee to show that the employee's protected conduct was "the primary basis for the discharge, threats, or discrimination." *Id.* § 1708.

The analysis under the WPA is similar to that for Plaintiff's First Amendment retaliation claim. Plaintiff has failed to show that his report was the primary basis for the non-renewal of his contract. It is clear from the record that the Committee was concerned with Plaintiff's performance prior to his report regarding Dr. Cogburn. The Committee and Dr. Gelb both urged Plaintiff to focus his research in his two-year review. (D.I. 42, Ex. 4). In each of Plaintiff's annual appraisals leading up to 2011, Plaintiff was advised to further develop his research at the University. (D.I. 36, Ex. I). In Plaintiff's 2011 appraisal, Plaintiff was informed that his accomplishments in research were still "lower than anticipated." (D.I. 36, Ex. M at 47). Plaintiff's four-year review was consistent with Plaintiff's two-year review and each of his annual appraisals. Plaintiff has failed to offer any evidence to show that his protected conduct was "the primary basis for discharge, threats, or discrimination."[4] Therefore, the Court grants summary judgment in Defendants' favor with regard to Plaintiff's whistleblower claim.

## IV. Conclusion

For the reasons set forth above, the Court will grant Plaintiff's motion to amend the complaint, and will grant summary judgment in favor of Defendants on all counts. A separate Order consistent with this Memorandum Opinion will be entered.

---

[4] There is a serious question as to whether Plaintiff has offered sufficient evidence to show he made the report he claims to have made. Other than his own testimony at deposition, there is not a shred of evidence in the record indicating that he made the report. It seems unlikely that a jury would be able to find clear and convincing evidence that Plaintiff's report was made. Ultimately, though, the issue involves a question of credibility, and questions of credibility are not suitable for resolution on summary judgment.

19